UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:15 CR 52 SNLJ (ACL) |
| | ) | |
| JERRY L. GATER, *pro se*, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). Pending before the undersigned is the Defendant Jerry L. Gater's *pro se* Motion to Suppress (Doc. 26) evidence seized from his residence and truck on December 16, 2014. On that day, officers executed a search warrant and seized drugs, digital scales, money, keys to the residence, and other evidence.

The Defendant asserts the following grounds for suppression: 1) the officers didn't have a valid search warrant, because the warrant was not filed in the Clerk's Office until the day after the search warrant was executed, 2) the search warrant was not supported by probable cause, 3) the search warrant affiant omitted facts regarding the informants from the Affidavit, 4) the officers did not follow policies on use of informants 5) the search warrant was an unlawful "general warrant" authorizing a search of the whole house, and 6) the execution of the warrant was unlawful, because entry was made through a window.

Gater also filed a Motion to Suppress the statements (Doc. 33) that were taken from him in early 2015 regarding his written "Request [for] Remission or Mitigation of an Administrative Forfeiture" concerning the money seized from his residence on December 16, 2014. The Government announced that it will not use any of the *statements made by Gater during a March 20, 2015 interview*, which was conducted in response to the written mitigation request. As a result, Gater's Motion to Suppress statements[1] is moot and need not be examined.

During the suppression hearing, Gater asked for his *written mitigation request* to be suppressed. Gater did not make any argument, or offer legal support for this request. Based on the record of the case, there are no grounds to suppress the written mitigation request that Gater voluntarily submitted to authorities. Gater made the written request in an effort to have the money that was seized during the December 16, 2014 search, returned to him. As no grounds for suppression of the written mitigation request have been offered, Gater's request should be denied. The admissibility of Gater's written request, however, may be further litigated at the pretrial phase of the case.

In addition, Gater filed several motions (Docs. 24, 28, and 31) requesting that the Court compel the Government to disclose various items of evidence. He also filed a supplement to his suppression motion. (Doc. 35.)

The Government filed a Response to the Defendant's claims. (Doc. 41.)

---

[1]  Gater did not move to suppress the statements he made at the police station on December 16, 2014. In any event, the record reflects that Gater's December 16, 2014 statements were made when he voluntarily went to speak with TFO Sullivan at the police station and Gater was given the *Miranda* warning prior to making any statements. As a result, Gater's December 16, 2014 statements are admissible at trial.

A hearing was held on July 23, 2015. The witnesses included Drug Enforcement Task Force Officer Bobby Sullivan and Detective Bobby Penrod, both employed by the Sikeston Department of Public Safety. After all evidence was received the parties offered oral argument. Following the hearing, Gater submitted a post-hearing memo. (Doc. 47.)

More than three weeks after the suppression hearing, Gater filed a "Motion for Dismissal of Charges and Case No. 1:15CR52." (Doc. 49.) To support his request for dismissal, Gater restates many of the arguments raised in his prior pleadings. He also filed a Motion to Compel (Doc. 53), which was electronically filed on September 8, 20015 and restates several of his previous arguments.

A supplemental evidentiary hearing was held on September 9, 2015, in order for the parties to "submit additional evidence regarding the timing of events between December 16, 2014 at 2:25 p.m. and the completion of the execution of the search warrant." (Doc. 51.) Prior to the hearing, the parties received the transcript of Officer Sullivan's testimony from the July 23, 2015 hearing. Officer Sullivan testified at the September 9 proceeding.

In consideration of the pleadings, all of the testimony of the witnesses, the exhibits admitted into evidence, as well as the oral and written arguments of the parties, the undersigned recommends that the following findings of fact and conclusions of law be adopted and that the Defendant's Motions to Suppress, Compel, and Dismiss be denied.

## I. Findings of Fact

Around the fall of 2014, law enforcement officers in Sikeston, Missouri received information that the Defendant, Jerry L. Gater, and others had been obtaining quantities

of cocaine and marijuana from a source in California for distribution in and around

Sikeston, Missouri. By the middle of December, Drug Enforcement Task Force Officer

(TFO) Bobby Sullivan received information from two separate confidential informants

that Gater was actively distributing controlled substances, including cocaine, crack

cocaine, and marijuana. According to TFO Sullivan, both informants had a history of

cooperating with law enforcement officers in a manner that resulted in successful drug

prosecutions at the state and federal levels.

On December 9, 2014, the first informant (CI #1) told TFO Sullivan that he/she

had observed Gater selling cocaine powder and crack cocaine from his truck in the area

of Luther, Dixie, and Osage streets in Sikeston, Missouri. CI #1 indicated that he/she had

observed Gater in possession of more than one ounce of powder and crack cocaine inside

of Gater's truck. CI #1 had a five year history of providing information to law

enforcement regarding narcotics trafficking. During that timeframe, CI #1 made

controlled purchases of drugs while wearing recording devices.

The following day, December 10, 2014, a second confidential informant (CI #2),

provided information regarding Gater to TFO Sullivan. CI #2 reported that he/she had

been to Gater's residence located at 101 DL Fulton in Sikeston, Missouri, at times when

other people purchased cocaine from Gater. CI #2 estimated that each time this happened

Gater was in possession of more than one ounce of crack cocaine.

On December 16, 2014, around 2:25 p.m., CI #2 contacted TFO Sullivan to report

that he/she had just been to Gater's residence (101 DL Fulton) and Gater was in

possession of approximately five ounces of cocaine and two pounds of marijuana. CI #2

added that Gater had a large quantity of cash which CI #2 estimated to be twenty thousand dollars; and described it as three large rolls of cash with one hundred dollar bills visible.

Neither CI #1 nor CI #2 participated in a controlled purchase of drugs from Gater, nor did they provide TFO Sullivan or any other law enforcement officer with a sample of drugs acquired from Gater. Each CI had a history of acting as a law enforcement informant and making controlled purchases of drugs that resulted in convictions of drug traffickers at the state and federal levels.

Upon receiving the information from CI #2 on December 16, 2014, TFO Sullivan asked Detective Bobby Penrod to initiate surveillance of Gater's residence. Detective Penrod responded to 101 DL Fulton to begin surveillance, which consisted of visually monitoring the residence by driving by or watching the residence from a location approximately one block away. Around 3:02 p.m., Detective Penrod observed a black male, wearing a gray hooded sweatshirt and tan pants, exit the residence and get into Gater's white Ford truck parked in front of the residence. Detective Penrod watched as the person manipulated something inside the truck, exited and closed the truck door, and then walked away from the area.

Around 3:14 p.m., TFO Sullivan and other officers went to Gater's residence with the intent of asking Gater for consent to search the residence. TFO Sullivan knocked on the door, but no one answered. Around 3:30 p.m., TFO Sullivan called Gater and asked Gater to meet at 101 DL Fulton. Gater declined the invitation, but agreed to meet TFO Sullivan at the police station. TFO Sullivan then returned to the police station and began

working on an application and affidavit for a search warrant to search Gater's residence and truck.

While at the police station, TFO Sullivan called Gater at least three times to find out when Gater was coming to the station. During the hearing, both parties asked questions that suggested Gater did not arrive at the station for questioning until roughly 6:33 p.m. TFO Sullivan's Affidavit (Gov't. Ex. #1; Doc. 41-1 at 5-7) that was attached to the Search Warrant Application, on the other hand, reflects that he received considerable information from Gater prior to 6:33 p.m., because TFO Sullivan recited many details regarding statements from Gater in the Affidavit which was signed by Judge Winchester at 5:33 p.m. (Gov't. Ex. #1; Doc. 41-1 at 7.)

Gater's cross-examination of TFO Sullivan on July 23, 2015, revealed that TFO Sullivan's written Report of Investigation (ROI, Def. Ex. A) summarizing the incident stated that TFO Sullivan did not speak with Gater until 6:33 p.m. The ROI also reported, however, that the Search Warrant was secured after TFO Sullivan spoke with Gater at the station. (Def. Ex. A at 3.) Nevertheless, during TFO Sullivan's testimony on July 23, he agreed that he had secured the warrant prior to interviewing Gater at the station and that he had returned to the station after securing the search warrant to conduct the interview of Gater.

The times that were reported for TFO Sullivan's interview of Gater are not consistent between the ROI (Def. Ex. A) and TFO Sullivan's Affidavit that was attached to the Search Warrant Application. Both the ROI and the Affidavit, however, reflect that TFO Sullivan presented the Search Warrant to Judge Winchester after he interviewed

Gater. While TFO Sullivan agreed during his suppression hearing testimony that Gater's statement was not received at the police station on December 16, 2014, until around 6:33 p.m., 1) TFO Sullivan's Affidavit and his ROI reflect that he interviewed Gater at the police station prior to applying for the Search Warrant and 2) the Sikeston DPS Dispatch Log (Govt. Ex. 48-1) reflects that the Search Warrant was executed at 5:36 p.m. TFO Sullivan's Affidavit reflects that he received substantial information from Gater during the interview at the station and that information was included in the Affidavit.

During a supplemental evidentiary hearing on September 9, 2015, Officer Sullivan explained that he made a mistake in his ROI (Def's Ex. A), in that he typed the time of Gater's interview in standard time as 6:33 p.m., when the time was really 16:33 in military time, which translates to **4:33 p.m.** Officer Sullivan testified that the Sikeston Department of Public Safety tracks events in military time while the Drug Enforcement Administration reports[2] events in standard time. TFO Sullivan indicated that his answers to some of the questions during the July 23 hearing were based on his faulty reliance that the 6:33 p.m. time was correct. During a portion of the questioning regarding the 6:33 p.m. timeline, TFO Sullivan replied, "I don't know. I don't have the report in front of me. I'm just telling you what the times are is the time that I have signed it before a judge." (Doc. 52 at 66.)

The certified copy of the Search Warrant with the accompanying Application and Affidavit are official court documents and they reveal that the county prosecutor signed

---

[2] As a DEA Task Force Officer, Officer Sullivan's written report regarding the investigation was prepared on a DEA Form-6, which is a "Report of Investigation. *See* Def. Ex. A.

the Application at 5:25 p.m., on December 16, 2014. Judge Winchester and TFO

Sullivan signed the documents at approximately 5:33 p.m., on December 16, 2014.

Furthermore, the Dispatch Log reflects that activity related to the execution of the Search

Warrant at 101 DL Fulton occurred between roughly 5:36 p.m. and 6:44 p.m., on

December 16, 2014. *See* Gov't. Ex. 48-1, also Doc. 48-1. The incident involving the

search warrant at Gater's residence was concluded the following evening, December 17,

2014, when Gater was arrested. If Gater had been interviewed at 6:33 p.m., as stated in

Officer Sullivan's ROI (Def's Ex. A) and his testimony on July 23, 2015, it would have

been after the seizure of the drug evidence located in his residence and there would have

been no reason for Gater's arrest to be delayed until the following evening.

During the supplemental hearing, TFO Sullivan agreed that it is important to be

accurate when writing investigative reports. He also admitted that he made several

mistakes when he prepared the ROI for the instant case related to times and dates. TFO

Sullivan's willingness to rely on the times cited by Gater during the July 23 hearing

without being certain they were correct, lack of recall of the sequence of events for the

investigation, and willingness to adjust the facts to an incorrect timeline regarding the

chronology of events on December 16, 2014, resulted in TFO Sullivan providing

inaccurate testimony while under oath. In consideration of the entire record--the Search

Warrant and dispatch log, in particular, as well as TFO Sullivan's September 9, 2015

testimony explaining his inaccurate testimony--the undersigned finds that TFO Sullivan

interviewed Gater at 4:33 p.m., prior to submitting the Application for Search Warrant to

Judge Winchester on December 16, 2014.

TFO Sullivan's Affidavit (Doc. 41-1 at 6, ¶ 7) reflects that when Gater arrived at the station, he was wearing the same clothing that Detective Penrod had reported was worn by the black male who exited 101 DL Fulton around 3:03 p.m., and got in Gater's truck. The Affidavit also reflects that when Gater spoke with TFO Sullivan and several other officers, he provided the following information: 1) Gater claimed he lived at several residences with various girlfriends, 2) Gater stated that his former girlfriend was the current renter of the residence located at 101 DL Fulton, 3) Gater explained that his truck was currently parked at 101 DL Fulton, but he does not live there, 4) Gater denied having a key to the residence, 5) Gater admitted being at the residence earlier in the day, but again stated that he did not live there, 6) Gater advised that his former girlfriend might be at work at the Convalescent Center, but he did not have a way to get in touch with her and did not know whether or not she had a cell phone. *Id*. at ¶ 8.

Not only had TFO Sullivan received information from Gater prior to presenting his Application for Search Warrant to the judge, he had also received information from Gater's landlord. The landlord advised officers that Gater was the current renter of the 101 DL Fulton residence and that Gater recently changed the locks. The landlord stated that his keys no longer worked for 101 DL Fulton.

By the time the search warrant package was ready for presentation to a judge, the Clerk's Office was closed. TFO Sullivan met with an assistant prosecutor at the police station for the prosecutor to review the search warrant package; the prosecutor signed the package at approximately 5:25 p.m. Next, TFO Sullivan went to the judge's residence so the judge could review the search warrant package. Scott County Circuit Court Judge

Winchester signed the Search Warrant for Gater's residence and truck at 5:33 p.m., on December 16, 2014. TFO Sullivan testified that the Judge's residence was a three to four minute drive from the police station and the same distance from Gater's residence, 101 DL Fulton.

The Search Warrant was executed at approximately 5:36 p.m., that evening. No one was home. To enter the residence, one of the officers opened a window that was unlocked and climbed through it so that the entry door would not be damaged; he then unlocked the door so the other officers could come inside. Officers seized more than nine grams of cocaine base, two sets of digital scales, U.S. currency totaling $4,600 that was separated in rolls of one hundred dollar bills, an expired identification card for Gater, a small quantity of marijuana, mail addressed to Gater and his former girlfriend, a box of partial plastic bags, keys to 101 DL Fulton found in Gater's truck, and a cricket bag. (Doc. 41-1 at 8.)

The search warrant package was filed in the Scott County Circuit Clerk's Office on December 17, 2014.

Also on December 17, 2014, the Defendant was arrested for drug related charges based on the items seized from his residence the day before. He volunteered to speak with officers about drug activities in the area, but did not want to speak about the drugs and other items that had been found at his residence. TFO Sullivan declined to interview the Defendant.

A couple of months later, Gater made a written claim ("Request in Mitigation") for the cash that was seized from 101 DL Fulton. On March 20, 2015, TFO Sullivan

interviewed Gater about the written claim. The Government announced it does not intend to offer any of the statements Gater made during that interview in the case-in-chief for this matter, but that it may use the information to impeach the Defendant if he chooses to testify. (Doc. 41 at 14.) As previously stated, the Government's announcement that it does not intend to offer the March 20, 2015 statements at trial moots Gater's Motion to Suppress those statements.

The undersigned will address Gater's suppression motions followed by consideration of his discovery requests and his Motion to Dismiss.

## II. Conclusions of Law

The foundation for several of Gater's arguments regarding the suppression of evidence from the December 16, 2014 search warrant is that 1) the search warrant secured by TFO Sullivan was not valid, because he did not file the search warrant application with the Circuit Clerk prior to executing it. Gater also argues that: 2) the search warrant was not supported by probable cause; 3) the search warrant affiant omitted facts from the Affidavit regarding the informants' bad character, criminal background, and the affiant's non-compliance with agency policy on informants; 4) the affiant also omitted the fact that the purchase of drugs reported by CI #2 was not corroborated by law enforcement; 5) the search warrant was an unlawful "general warrant" authorizing a search of the whole house; and 6) entering the residence through the window to execute the warrant was unlawful. Gater's arguments fail for the reasons set out below.

**II.A.**   **Filing the search warrant with the Clerk's Office the day after the search was lawful.**

Gater argues that his due process rights were violated because the December 16, 2014 search warrant was not filed in the Scott County Circuit Clerk's Office until the morning after the search warrant was executed. Gater claims that TFO Sullivan violated § 542.276.2(7), which provides that "[t]he application shall. . .be filed in the proper court." Gater insists that the statute requires that an application be filed with the Clerk in order for a search warrant to be valid. Gater's interpretation of the statute is incorrect as it does not require that a search warrant application be *filed with the Clerk* for it to be "filed."

In Missouri, "[a]ny peace officer. . .may make application. . .for the issuance of a search warrant." RSMo. § 542.276.1. In this case, the search warrant package was not ready for filing until after the Clerk's Office was closed, making it necessary for TFO Sullivan to submit the Application for Search Warrant to Associate Circuit Judge Winchester at the judge's residence.

The instant Search Warrant itself explains that:

*an application in writing, duly verified by oath, has been filed with the undersigned Judge of this court* stating upon information and belief that cocaine/controlled substances and/or evidence of the distribution of controlled substances are being kept at 101 DL Fulton in Sikeston, Scott County Missouri...

(Gov't. Ex. #1; Doc. 41-1 at 1, emphasis added.) TFO Sullivan's act of taking his Application for Search Warrant and Affidavit to Judge Winchester's residence satisfied § 542.276.2(7)'s requirement to "file" said application in the "proper court." The fact the

documents were not formally filed in the Clerk's Office until the following day is of no consequence.

A certified copy of the Application for Search Warrant and attached Affidavit, as well as the Search Warrant for Gater's residence and truck were submitted as Government Exhibit #1 during the hearing. The exhibit reveals that the search warrant package was filed in the Scott County Circuit Clerk's office on December 17, 2014. Judge Winchester signed TFO Sullivan's Application and the Search Warrant on December 16, 2014. The paragraph above Judge Winchester's signature on the Search Warrant states "[w]itness my hand and the seal. . .of this Court on this 16 day of December 2014, at 5:33 p.m." (Gov't. Ex. #1 at 2; Doc. 41-1 at 2.)

Furthermore, as articulated by the Government:

> The Eighth Circuit has held that, even if an application is never filed with the Clerk, the defendant is not prejudiced if the application was presented to a Magistrate for determination of probable cause. [*United States v. Timley*, 443 F.3d 615, 624 (8th Cir. 2004).] "[E]vidence seized by State officers in conformity with the Fourth Amendment will not be suppressed in a federal prosecution simply because the underlying search warrant failed to conform to state law." *United States v. Dishman*, 377 F.3d 809, 811 (8th Cir. 2004).

(Doc. 41 at 11.)

TFO Sullivan "filed" his Application for Search Warrant with Judge Winchester at 5:33 p.m., on December 16, 2014. This procedure protected Gater's procedural due process rights and was in conformity with state law. The December 16, 2014 Search Warrant for Gater's residence and truck was valid.

Gater's interpretation of the statute would restrict law enforcement officers to only applying for search warrants during the business hours of clerk's offices.[3] The statute does not require that limitation, which would severely impede the effective, proper, and efficient enforcement of state criminal laws.

Gater's request for suppression on this ground should be denied.

## II.B.1.     The search warrant was supported by probable cause.

Gater also argues that TFO Sullivan's Affidavit was not based on reliable or credible information that drug evidence would be found at his residence. Additionally, he claims that the Affidavit contained misleading information and that it omitted information. Gater's complaint regarding misleading and omitted information is based on his view that TFO Sullivan did not adequately explain that the information from both informants was simply volunteered and did not involve any law enforcement control. For example, Gater complains that TFO Sullivan had no corroboration of CI #2's visit to his residence on December 16, 2014, other than CI #2's report that he/she had been there and observed illegal conduct.

_____

[3] During the supplemental hearing on September 9, 2015, Gater asked the undersigned to take judicial notice of *United States v. Golay*, 502 F.2d 182 (8th Cir. 1974), *United States v. Schauble*, 647 F.2d 113 (10th Cir. 1981), *State v. Hodges*, 705 S.W.2d 585 (Mo.App. 1986), and *State v. Abbott*, 429 A.2d 437 (Conn.App. 1985). Each of the cases hold that time periods of between 48 hours up to sixteen days after an informant reported observing illicit conduct in a protected location to law enforcement officers was not too long of a delay for the information to be considered stale and for a search warrant to be executed. Gater stated, "[Officer Sullivan] had plenty of time to. . .he could of waited until the next morning and got a search warrant and this would have been all legal." (Doc. 54, *see* FTR Gold at 11:34:56 to 11:35:05.) Gater's argument is without merit.

Probable cause to issue a warrant exists when an affidavit sets forth sufficient facts to justify a prudent person in the belief that contraband will be found in a particular place. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983). Whether probable cause has been established involves the practical common sense evaluation of the totality of the circumstances. *Gates*, 462 U.S. at 238.

The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions:

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

*Brinegar v. United States*, 338 U.S. 160, 175 (1979).

Probable cause is a "fluid concept turning on the assessment of probabilities in particular factual contexts--not readily or even usefully reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. Further, probable cause in an affidavit "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.* at 632. All that need be shown for probable cause to search is that there is a "fair probability" that contraband or evidence of a crime will be found at the premises to be searched. *Gates, supra.* Also, affidavits should not be read in a hypertechnical manner. *See United States v. Ventresca*, 380 U.S. 102 (1965).

Probable cause may be found in hearsay statements from reliable persons, *Gates*, 462 U.S. at 245; in hearsay statements from confidential informants corroborated by independent investigation, *Draper v. United States*, 358 U.S. 307, 313 (1959); or in

observations made by trained law enforcement officers, *McDonald v. United States*, 335 U.S. 451, 454 (1948). While these are some of the ways in which probable cause is commonly established, they are by no means all-inclusive. Information contained in applications and affidavits for search warrants must be examined in the totality of the circumstances presented. *Gates*, 462 U.S. at 230. "'The preference for warrants is most appropriately effectuated by according great deference to a magistrate's determination' as to whether an affidavit establishes probable cause." *United States v. Leon*, 468 U.S. 897, 914 (1984).

When an "affidavit is based on information from an informant, the informant's reliability, veracity, and basis of knowledge are relevant to whether the affidavit provided probable cause to support the search." *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005), citing *United States v. LaMorie*, 100 F.3d 547, 553 (8th Cir. 1996). The credibility and reliability of an informant are not "separate and independent requirements to be rigidly exacted in every case." *Gates*, 462 U.S. at 230. As the Supreme Court elucidated, "[i]nstead, they are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id*. at 233 (citations omitted). *See also United States v. Harris*, 403 U.S. 573, 584-85 (1971) (The reliability that comes from knowing an informant's identity is not based on inclusion of their name in the affidavit, but rather on the fact that if he/she is lying he/she may be prosecuted under state laws for making a false statement to police.)

Courts may consider whether information supplied by an informant is corroborated by other information known to law enforcement when examining whether the totality of the circumstances supports a finding of probable cause. *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993).

An examination of the information contained in the Affidavit supports that there was sufficient probable cause to search Gater's residence and truck for "cocaine/ controlled substances and or evidence of the distribution of controlled substances." (Doc. 41-1[4] at 1.) The Affidavit revealed that law enforcement officers had been receiving information for the previous several months that Gater and other identified individuals had been obtaining large quantities of cocaine and marijuana in California for distribution in Sikeston, Missouri. (Doc. 41-1 at 5, ¶ 2) In addition, within three weeks prior to TFO Sullivan's application for the Search Warrant in question, he received information from CI #1 (who had a five year history of making controlled purchases that resulted in criminal convictions) that CI #1 had observed Gater selling drugs from his truck in a particular area of Sikeston. CI #1 added that Gater possessed "more than an ounce of powder and crack cocaine inside his truck." *Id.* at ¶ 3. Furthermore, the intelligence information and CI #1's information was also consistent with the information provided by CI #2, who stated that he/she had been at Gater's residence on several occasions when other individuals were purchasing cocaine from Gater. CI #2 explained that on each of those occasions Gater was in possession of more than an ounce of crack cocaine. *Id.* at ¶

---

[4] TFO Sullivan's Affidavit was also a part of Gov't. Ex. #1, the complete search warrant package.

34. TFO Sullivan received even more recent information from CI #2 on the day the search warrant was sought; CI #2 reported being at Gater's residence early that afternoon and observing Gater in possession of approximately five ounces of cocaine, two pounds of marijuana, and three large rolls of cash that CI #2 estimated to be as much as $20,000. *Id.* at ¶ 5. TFO Sullivan also explained that surveillance of Gater's residence was quickly initiated by another Detective who witnessed an individual wearing a dark hooded sweatshirt exit Gater's residence, enter Gater's truck and manipulate something inside the truck before departing the area on foot. *Id.* at ¶ 6. TFO Sullivan explained that he went to Gater's residence and knocked on the door, but no one answered. He then called Gater and asked for him to come to the residence, but Gater suggested meeting at the police station instead. TFO Sullivan noted that when he met with Gater later that same day at the station, Gater was wearing a dark hooded sweatshirt, just as Detective Penrod had observed earlier that day. *Id.* at ¶ 7. Next, TFO Sullivan included a summary of statements Gater made to him and other officers at the police station, including the fact that Gater denied having a key to the residence, or that he lived there. *Id.* at ¶ 8. Contrary to Gater's denial that he lived at the residence, the landlord told TFO Sullivan that Gater was the person who leased the residence and that Gater had recently changed the locks for the residence. *Id.* at ¶ 9. Finally, TFO Sullivan detailed some of the habits of drug traffickers based on his experience and training (*i.e.*, the types of information maintained and storage practices). *Id.* at ¶ 10.

The undersigned concludes that there was at least a "fair probability" that items relating to the possession and distribution of controlled substances would be found within

Gater's residence. Therefore, probable cause existed to search Gater's residence and his Motion to Suppress Evidence for lack of probable cause should be denied.

## II.B.2. Information contained in the Affidavit established reliability of both confidential informants.

Gater also complains that the reliability of the confidential informants was inadequate because the reported observations of the informants were not made under circumstances controlled by law enforcement, there was no explanation as to what training the informants had regarding identification of controlled substances, and both informants were "known" substance abusers. (Doc. 26 at 3-5.)

"The reliability of a confidential informant can be established if the person has a history of providing law enforcement officials with truthful information." *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993). Absent indicia of an informant's reliability, courts insist that search warrant affidavits contain substantial police corroboration, which "may be established by a police-monitored controlled buy...." *United States v. Hawkins*, 278 Fed.Appx. 629, 635 (8th Cir. 2008). *See also United States v. Neal*, 528 F.3d 1069, 1073-74 (8th Cir. 2008) (proven reliability of informant was supported by a single controlled buy from defendant and description of firearms informant observed in defendant's residence). The undersigned notes that a controlled buy is just one example of how the police might adequately corroborate an informant's reliability.

Furthermore, it is well established that:

[a]dmissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search. That the informant may be paid or promised a

'break' does not eliminate the residual risk and opprobrium of having admitted criminal conduct.

*United States v. Harris*, 403 U.S. 573, 583-84 (1971); *see also United States v. Pennington*, 287 F.3d 739, 742 (8th Cir. 2002) (fact that an informant implicated himself in criminal activity to the police supports a finding of probable cause to search). In essence, an informant's admissions regarding involvement in recent and continued illicit activity has the effect of enhancing the informant's credibility and reliability rather than deflating it.

In this case, the information contained within the Affidavit established that the information provided by CI #1 and CI #2 was reliable. TFO Sullivan explained that CI #1 had worked as an informant for the prior five years under circumstances where CI #1 wore a recording device while making controlled purchases and that CI #1's work had resulted in successful criminal prosecutions at the state and federal levels. CI #2 had done the same for a period of three years prior to TFO Sullivan's application for the instant Search Warrant. During the suppression hearing, TFO Sullivan explained that one of the informants had participated in approximately twenty-five controlled purchases while the other had participated in approximately one hundred twenty. It was not necessary for TFO Sullivan to state that the information he received from the informants was not obtained in controlled circumstances, as that is clear from a common sense reading of the Affidavit.

In addition, both informants admitted being in the presence of other individuals who purchased cocaine from Gater within three weeks and only a few hours of when

TFO Sullivan applied for the instant Search Warrant. The information of the two informants was also consistent regarding the quantity of cocaine Gater typically possessed, in that they both reported seeing Gater in possession of more than an ounce of powder or crack cocaine when he was observed selling the substance to others. (Doc. 41-1 at 5, ¶¶ 3 and 4.) Interestingly, CI #1's report that he witnessed others purchasing drugs from Gater is consistent with Gater's gratuitous claim[5] that CI #1 had unsuccessfully attempted to purchase drugs from Gater. (Doc. 26 at 3.)

Gater also suggested that the person he believes to be CI #2 had been to his residence on the day the search warrant was executed and he alleged that CI #2 planted the drugs that were seized from his residence and stole money from him. (Doc. 26 at 4.) Gater did not present any evidence to support his claims regarding CI #1 or CI #2 during the hearing.

Importantly, TFO Sullivan did not rely solely on the statements of the informants, although that would have been sufficient. TFO Sullivan had some corroboration of the information provided by the informants based on the intelligence information that had been received by law enforcement regarding Gater and some of his known associates, as well as information from Gater's landlord who reported that Gater lived at the residence in question.

When considering the totality of the circumstances presented in TFO Sullivan's Affidavit, sufficient information was relayed for the informants (CI #1 and CI #2) to be

---

[5] "This CS has tried to purchase drugs from Defendant unsuccessfully and promised to get back at Defendant because he didn't have drugs to supply the CS's addiction."

deemed reliable. First, the informants' significant history of working with law enforcement by participating in controlled purchases of drugs that resulted in criminal convictions in state and federal court was strong evidence to support their reliability. Second, the information provided by CI #1 was consistent with the information provided by CI #2, and vice versa. Finally, TFO Sullivan had received other intelligence within the law enforcement community confirming Gater's involvement in drug trafficking.

This analysis demonstrates that the reliability of the informants was sufficiently established. Gater's request for suppression based on an allegation that the informants' reliability was not established should be denied.

### II.B.3. Omissions regarding the character and background of informants

Gater also claims that the policy on use of informants was not only violated in his case, but that law enforcement regularly "use people as informants who are everyday common drug abusers, liars, thieves, burglars, and totally dishonest people." (Doc. 26 at 2.) In making this claim, Gater further alleges that TFO Sullivan "omitted information from the affidavit in relation to the departmental policy on informants and information advising that he did not follow those procedures." *Id.* Gater further alleges that CI #1 is an alcoholic and daily user of powder cocaine; and that CI #2 is an abuser of various drugs, suffers from mental illness, and is a prostitute. The undersigned will construe Gater's arguments in this regard as an allegation of material omissions in TFO Sullivan's Affidavit, a "Reverse *Franks* Claim."

As a general matter, "all evidence obtained by an unconstitutional search and seizure is inadmissible in a federal court regardless of its source." *Mapp v. Ohio*, 367

U.S. 643, 654 (1961). In *Franks v. Delaware*, 438 U.S. 154 (1978), the Court recognized a defendant's right to challenge the sufficiency of an executed warrant on the basis that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and. . .the allegedly false statement is necessary to the finding of probable cause." *Id.* at 155-56.

Allegations of material omissions, on the other hand, "are held to a higher standard. *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008). The Fourth Circuit articulated why this is so:

> While omissions may not be *per se* immune from inquiry, the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory. This latter situation potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit. The potential for endless rounds of *Franks* hearings to contest facially sufficient warrants is readily apparent.

*United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990).

In the Eighth Circuit, to prevail on a *Franks* challenge that involves allegations of material omissions of fact, Gater must show:

> (1) that TFO Sullivan omitted facts "with the intent to make, or in reckless disregard of whether they thereby make, the affidavit misleading," and (2) "that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause."

*United States v. Buchanan*, 167 F.3d 1207, 1210 (8th Cir. 1999) (citations omitted).

In this case, Gater argues that TFO Sullivan's affidavit had material omissions, because he did not provide information regarding the informants' character and

background, and a related matter of whether the policy on use of informants was followed. If TFO Sullivan had articulated such information in his Affidavit, it would not have had a bearing on the probable cause determination for the following reason:

Considering that "it is often people involved in criminal activities themselves that have the most knowledge about other criminal activities," it is no surprise that most confidential informants are engaged in some sort of criminal activity. It would unduly hamper law enforcement if information from such persons were considered to be incredible simply because of their criminal status. Without more than a mere allegation that the affiant failed to disclose the nature and degree of the confidential informant's criminal activity, [the defendant] was not entitled to a *Franks* hearing.

*Fowler*, 535 F.3d at 416 (internal citation omitted). The fact that the informants were engaged in criminal activities, which were likely related to their substance abuse, might make the informants less credible than a member of the general population, but that is hardly a reason to doubt the reliability of the information given to TFO Sullivan, especially given the numerous indications of reliability provided in the affidavit. The truth of the matter is that to some degree the informants' experiences as substance abusers and in drug trafficking, actually increases the reliability of the information provided.

In this case, there is no evidence to support that TFO Sullivan intended to omit facts to make the affidavit misleading, or that he did so in reckless disregard of making the affidavit misleading. TFO Sullivan's testimony supported the assessment in *Fowler*, supra, that confidential informants are generally involved in criminal activity, which puts them in a position to report current information regarding criminal conduct to law enforcement. In addition, even if TFO Sullivan had included the bad character

information Gater alleges concerning the two informants used in the instant case, there still would have been sufficient probable cause to support the authorization of the search warrant. *See United States v. Wilson*, 324 Fed.Appx. 546, 548 (8th Cir. 2009) (unpublished) (Affiant omitted material facts that (1) CI was a cocaine user, (2) CI received a shot for pain on the day of the interview, affecting CI's mental state, and (3) CI was hostile toward defendant; even if true these facts do not make the affidavit misleading and *Franks* hearing was not required.).

Gater's request for suppression on this ground should be denied.

## II.B.4. Additional alleged omissions of facts from Search Warrant Affidavit did not warrant a *Franks* hearing.

In a single sentence, Gater once again challenges the validity of the search warrant based on omissions of information from the Affidavit. (Doc. 26 at 7.) Gater made an incomplete claim when he stated, "[w]here police arguably omit[] facts from Search or Arrest Warrant Affidavit material to finding of probable cause with reckless disregard for truth." *Id.* Gater does not offer any facts or explanation to support this claim. An earlier section of Gater's Motion includes a complaint that "with the omitted information placed in the Affidavit it is clear the Affidavit does not show probable cause to believe drugs would be found at the residence." *Id.* at 5. The "omitted facts" Gater is referencing appear to be his unsupported allegation that CI #2 planted the seized evidence in his residence before contacting law enforcement; and that TFO Sullivan simply accepted CI #2's claims regarding what CI #2 observed at Gater's residence without corroborating CI #2's report. *See id.* at 4-5.

Under the Fourth Amendment, law enforcement officers may not obtain a search warrant through statements which are intentionally or recklessly false. *Franks v. Delaware*, 438 U.S. 154, 155-156 (1978). In this instance, if Gater's allegations as to CI #2's conduct are true, Gater admits that "Affiant may not have known of [CI #2's] actions but he was well aware that he had not corroborated that she went to the residence in a controlled police environment or that he had not surveilled her visit to the residence." (Doc. 26 at 4.)

To obtain a *Franks* hearing based simply on purported falsehoods of a confidential informant, the defendant must show that the confidential informant was in fact acting as a government agent. *United States v. McAllister*, 18 F.3d 1412, 1417 (7th Cir. 1994).

An Eighth Circuit case, *United States v. Hollis*, 245 F.3d 671, 673-74 (8th Cir. 2001), involved very similar circumstances as the instant case. In *Hollis*, a trooper received information from a reliable confidential informant who voluntarily reported that he/she had recently seen methamphetamine in the defendant's residence. That information was relayed in an affidavit to secure a search warrant, along with the trooper's note that the informant had given reliable information on numerous occasions during the previous two years. At a motion hearing, it was learned that the informant had also stated that while at the defendant's residence a friend purchased methamphetamine, but that information was not included in the trooper's affidavit. Also during the hearing, a woman who claimed to be the informant's friend and claimed to be with the informant at the defendant's residence on the date in question testified that she had not purchased drugs or seen drugs at the defendant's residence. The Eighth Circuit concluded that the

defendant failed to show that the informant was acting as a government agent and that a *Franks* hearing was not required, because there was no evidence that the trooper had made a deliberately false statement or included a statement with a reckless disregard for the truth.

Gater has not offered any evidence that TFO Sullivan's sworn statements in support of the search warrant were deliberately or recklessly false. The claimed omission of information that Gater proffered to the Court in his Motion (Doc. 26 at 4-5, *i.e.*, that CI #2 planted drugs in house and stole money) does not render the affidavit false or misleading. There is no evidence that TFO Sullivan believed or had reason to suspect that CI #2 was lying about the presence of drugs and drug proceeds at Gater's residence. Furthermore, the Supreme Court's decision in *Franks* does not allow a defendant to impeach the statements of a "nongovernmental informant." *Franks*, 438 U.S. at 71.

The most important factors in determining whether a private citizen was acting as an agent of the government are whether the government acquiesced in the citizen's improper conduct, and whether the citizen was acting to assist law enforcement or to further his own ends. *United States v. Hollis*, 245 F.3d 671, 674 (8th Cir. 2001), quoting *United States v. Malbrough*, 922 F.2d 458, 462 (8th Cir. 1990). Gater has not shown that law enforcement acquiesced in CI #2's allegedly false statements, or that CI #2 had a public-spirited, as opposed to a self-serving, reason for providing those statements to law enforcement. In this instance, in providing information to TFO Sullivan, CI #2 acted on his/her own initiative. The manner in which the Affidavit was written makes it clear that the information reported by CI #2 was not gained under circumstances controlled by law

enforcement. Gater failed to show that CI #2 was acting as a government agent. Under these circumstances, the Court is not required to hold a *Franks* hearing as there was no misconduct by TFO Sullivan; he simply reported the information that had been given to him by someone who had previously been identified as a reliable confidential informant.

Gater's request for suppression on this ground should be denied.

## II.B.5. Particularity of Warrant was sufficiently definite.

Gater also challenges that the search warrant was impermissibly vague by suggesting that it violated the "particularity requirement" and was nothing more than a "general warrant as [it] authorize[d] a search of the entire premises including vehicles." (Doc. 26 at 6-7.)

The Fourth Amendment prohibits "general warrants" in an effort to prevent exploratory rummaging in a person's belongings by requiring that a "particular description" of the thing to be seized be stated in the warrant. *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). The constitutional standard of particularity of description in a search warrant is met if the description is sufficiently definite so as to enable the officer with the warrant to reasonably ascertain and identify the place to be searched and the objects to be seized. *Steele v. United States*, 267 U.S. 498 (1925); *United States v. Davis*, 557 F.2d 1239, 1248 (8th Cir. 1977); and *United States v. Johnson*, 541 F.2d 1311, 1313 (8th Cir. 1976). Accordingly, the degree of specificity required is flexible, and may vary depending on the circumstances and the type of items involved. *United States v. Davis*, 542 F.2d 743, 745 (8th Cir. 1976). The underlying measure of adequacy in the description is whether, given the specificity in the warrant, a

violation of personal rights is likely. *Johnson*, 541 F.2d at 1313; *United States v. Muckenthaler*, 584 F.2d 240, 245 (8th Cir. 1978).

In the instant case, the Warrant provided for the search of the residence located at 101 DL Fulton in Sikeston, Missouri, the white Ford F150 truck that Gater had been driving at the time, and "any vehicle and/or out buildings on the property" at the time of the search at the subject property. Officers had the subject residence under surveillance when TFO Sullivan applied for the Search Warrant and the officers executed it the same evening it was signed.

The category of items that were identified as being subject to seizure from the residence and truck were described with as much specificity as possible, given the nature of the case--"evidence of the crime of possession/manufacture of controlled substance and drug paraphernalia consisting of. . ." *See* Gov't Ex. #1 and Doc. 41-1 at 1. The description provided was specific enough to enable the officers to reasonably ascertain and identify the items to be seized, which were all items that could be admissible evidence useful in obtaining a conviction, otherwise known as "evidence of crime." Consequently, the seizing officers' discretion was narrowly channeled to the specific categories of items identified, making a violation of Gater's rights unlikely. In fact, the officers seized only the types of evidence described in the warrant: drugs, digital scales, packaging materials, cash, and items showing indicia of residency at the place searched.

Gater's claim that the warrant lacked "particularity" is without merit.

## II.B.6. Good Faith Exception

Further, even if the Affidavit failed to establish probable cause, evidence obtained as a result of the search of Gater's residence cannot be excluded because the search warrant was based upon TFO Sullivan's good-faith reliance on the judicially authorized search warrant. *United States v. Leon*, 468 U.S. 897, 920, 921 (1984). The good-faith exception allows evidence obtained pursuant to a search warrant that is later found to be invalid, to be admissible if the executing officers acted in good faith and in objectively reasonable reliance on the warrant. *Id*. at 922.

An officer's reliance on a search warrant is unreasonable and the *Leon* good faith exception does not apply when:

(1) the magistrate judge issuing the warrant was misled by statements made by the affiant that were false or made "in reckless disregard for the truth"; (2) "the issuing magistrate judge wholly abandoned his [or her] judicial role"; (3) the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or (4) the warrant is "so facially deficient. . .that the executing officers cannot reasonably presume it to be valid."

*United States v. Guzman*, 507 F.3d 681, 685 (8th Cir. 2007). *See also Leon*, 468 U.S. 897 at 832.

When assessing the objective good faith of police officers executing a warrant, courts examine the totality of the circumstances. *United States v. Simpkins*, 914 F.2d 1054, 1057 (8th Cir. 1990). In the absence of allegations that the affiant gave false information to, or of misconduct on the part of, the issuing judge, the determination is

based upon whether an objectively reasonable officer could have believed the seizure valid. *Id.*

In the instant case, there is no evidence that the authorizing judge was misled or abandoned his judicial role. Further, the warrant and application were not so lacking in indicia of probable cause, or the warrant so facially deficient that reliance upon the search warrant was unreasonable. The Court finds reliance on the search warrant by executing officers to be reasonable and in objective good faith.

Finally, the officer acted reasonably in attempting to obtain the warrant, and taking the necessary steps to present the warrant application to Judge Winchester. Therefore, the undersigned concludes that the Warrant and Affidavit were also sufficient under *Leon* standards.

## II.C. Entering the residence through an unlocked window after knocking and announcing police presence was lawful.

Gater contends that the officers failed to knock and announce their presence and that entrance through a window of the residence was unlawful. The uncontroverted testimony at the hearing revealed that the officers knocked and announced their presence multiple times, including knocking on the windows. After no one responded to the announcement of the officers' presence, one of the officers entered the home through an unlocked window so as not to damage the property by forcibly entering through a locked door.

Missouri law provides that "[t]o make an arrest in criminal actions, the officer may break open any outer or inner door or window of a dwelling house or other building, or

any other enclosure, if, after notice of his office and purpose, he be refused admittance."

RSMo. §544.200. In 1995, the Supreme Court concluded that the common-law knock

and announce "principle is an element of the reasonableness inquiry under the Fourth

Amendment." *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995).

In any event, even if the officers had failed to knock and announce their presence,

the Supreme Court in *Hudson v. Michigan*, 547 U.S. 586, 589-602 (2006), agreed with

the lower Michigan court that suppression is inappropriate when entry is made pursuant

to a valid warrant, but without officers properly knocking and announcing their presence.

As the Court aptly noted, the knock-and-announce rule has never protected "one's

interest in preventing the government from seeing or taking evidence described in a

warrant." *Id*. at 594.

The evidence adduced at the hearing supports that the conduct of the officers in

knocking and announcing their presence multiple times before entering through an

unlocked window was in compliance with the applicable state law.

Gater's claim that the officer's entry was unlawful is without merit.

### III.    Discovery Requests

In addition to his Motions to Suppress Evidence, Gater made several requests for

discovery, including a Motion to Compel (Docs. 24, 28, and 31) the Government to

disclose a number of items.

### III.A. Items that do not exist need not be produced.

In the Government's written response and during the hearing, the Government advised that some of the items Gater requested do not exist. Those items include:

1) audio/video recordings of CI #1's and CI #2's statements to law enforcement that were recited in the search warrant affidavit;

2) video-surveillance of Gater's residence prior to the execution of the search warrant on December 16, 2014;

3) video-recording of the interview of Gater at the police station on December 16, 2014, as well as his arrest on December 17, 2014;

4) audio-recordings of the dispatch communications regarding the investigation of and the execution of the search warrant at Gater's residence.

As the aforementioned items do not exist, Gater's request for the production of said items should be denied.

### III.B. Policies on Use of Informants

Other items Gater requested include copies of the Sikeston Department of Public Safety's and federal government's policy on use of informants. Gater provided no authority nor did he articulate a good cause basis for requiring the disclosure of the policies. In addition, F.R.C.P. 16 does not support that the Government has an obligation to disclose the policies. Furthermore, the undersigned has found no authority indicating that such policies should be disclosed in criminal proceedings.

As to the federal guidelines regarding use of informants, one case in this District recited a provision from those guidelines which states: "Nothing in these Guidelines is

intended to create or does create an enforceable right or private right of action by a CI or any other person." *United States v. Wilson*, 2007 WL 4205800 at *5 (E.D.Mo., Nov. 26, 2007) (unpublished), quoting the Attorney General's Guidelines, § I.H Rights of Third Parties. *See also United States v. Wedelstedt*, 589 F.2d 339, 343 (8th Cir. 1978).

Gater's request for the production of the Sikeston DPS and federal policies concerning use of informants is denied as the Court finds that the policies do not create an obligation of disclosure.

Also in this vein is Gater's request for Judge Winchester's warrant log. A certified copy of the search warrant in this case has been provided. The Government responded that it is not in possession of a "warrant log." (Doc. 41 at 16.) Gater cites no authority to support that there is a basis to compel the Government to produce a document that it does not possess. If such a log exists, Gater may request the assistance of his standby counsel to request a copy of it. In any event, Gater's request for a warrant log should be denied.

### III.C. Grand jury testimony

Gater also requested that "the Court [] order or cause discovery to be provided to him including. . .grand jury testimony." (Doc. 24 at 2.)

"Unlike an ordinary judicial inquiry, where publicity is the rule, grand jury proceedings are secret." *Levine v. United States*, 362 U.S. 610, 617 (1960). "To make public any part of its proceedings would inevitably detract from its efficacy." *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959). There are limited exceptions to this long-established policy of secrecy. *Id.*; Fed.R.Crim.P. 6(e).

If a witness testifies at trial, any testimony by that witness before the grand jury constitutes a statement required to be produced at the time of trial pursuant to the Jencks Act, 18 U.S.C. §3500, upon appropriate request, insofar as it relates to the subject matter of the witness's trial testimony. Generally, production of grand jury statements cannot be compelled prior to the witness's testimony at trial. *See Dennis v. United States*, 384 U.S. 855, 875 (1966); *United States v. Harflinger*, 436 F.2d 928, 935 (8th Cir. 1970); *United States v. Bruton*, 647 F.2d 818, 824 (8th Cir. 1981); 18 U.S.C. 3500(b) and e(3).

Rule 6(e)(3)(C)(II) of the Federal Rules of Criminal Procedure permits a court to authorize disclosure of grand jury proceedings "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury[.]" "Courts have expressed the balance between the policy of secrecy which is to be afforded grand jury proceedings and the limited exceptions in which disclosure may be made by recognizing that the party moving for disclosure must establish a 'particularized need.'" *Thomas v. United States*, 597 F.2d 656, 657 (1979); *United States v. McDougal*, 559 F.3d 937, 840-41 (8th Cir. 2009) (citing *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 443 (1983)). "[T]o demonstrate a particularized need, a defendant must show that the request for disclosure is: (1) required to avoid possible injustice in a different judicial proceeding, (2) greater than the need for continued secrecy, and (3) specifically directed at the material required." *McDougal*, 559 F.3d at 841 (citing *In re Grand Jury Proceedings Relative to Perl*, 838 F.2d 304, 306 (8th Cir. 1988)). Whether to permit disclosure of grand jury proceedings is a matter within the trial court's discretion. *Pittsburgh Plate Glass*, 360 U.S. at 400.

Gater offers no support for why he is entitled to grand jury testimony at this time.

Gater has failed to show a particularized need for the grand jury records requested. "Such 'fishing expeditions' do not provide sufficient grounds for disclosure prior to or at trial." *Thomas*, 597 F.2d at 658 (citations omitted).

The Government indicated that it will comply with the dictates of the Federal Rules of Criminal Procedure and the Jencks Act. (Doc. 41 at 17.) This response moots the relief sought by Gater regarding the grand jury testimony of Government witnesses.

**III.D. Access to computer**

Gater requests access to a computer in order to defend himself.

Eighth Circuit case law makes it clear that "[p]ro se defendants have a right of access to 'adequate law libraries **or** adequate assistance from persons trained in the law.'" *United States v. Knox*, 950 F.2d 516, 519-20 (8th Cir. 1991) (quoting *United States v. West*, 557 F.2d 151, 153 (8th Cir. 1977)) (internal quotations omitted) (emphasis added). In this case, Gater has refused the assistance of counsel. A pretrial detainee does not have the "abstract right to law libraries or legal assistance" that Gater seeks, especially where, as here, he has chosen not to avail himself of counsel and he has access to the standby counsel appointed by the undersigned. *United States v. Kind*, 194 F.3d 900, 905 (8th Cir. 1999). *See also United States v. Cooper*, 375 F.3d 1041, 1051-51 (10th Cir. 2004) ("When prisoner voluntarily, knowingly and intelligently waives his right to counsel in a criminal proceeding, he is not entitled to access to a law library or other legal materials.").

Just as a *pro se* defendant is not entitled to access to a law library or other legal materials, the undersigned finds Gater does not have the right to access a computer.

### III.E. Other requests

Gater also requested assistance with the service of subpoenas, which were authorized by this Court. (Doc. 40.) Additionally, he requested a transcript of the preliminary hearing for his state case regarding the search warrant discussed herein. Standby counsel acquired a recording of said hearing and Gater was given the opportunity to listen to the recording. Based on listening to the recording, Gater advised the Court that said request has been satisfied. As such the requests detailed in this paragraph are moot.

### III.F. Motion to Dismiss

Lastly, Gater filed a "Motion for Dismissal of Charges and Case No. 1:15CR52" (Doc. 49), wherein he restates many of his arguments although with new headings such as Prosecutorial Misconduct, Bill of Particulars/Nondisclosure, and Prosecutorial False or Misleading Grand Jury. Much of the case law offered does not stand for the proposition described. For example, Gater avers that *Scher v. United States*, 305 U.S. 251, 254 (1938) means that he should receive Judge Winchester's warrant log even though public policy forbids disclosure unless the disclosure is "essential to the defense, as, for example where this turns upon an officer's good faith." (Doc. 49 at 7-8.) The *Scher* case involved an officer who made a search of a vehicle without a search warrant and the disclosure in question was the identity of the source of information who reported the defendant illegally possessed liquor. This case involved an officer who in fact applied for a search

warrant and there has been no request for the identity of the informants. The *Scher* case

and many others cited by Gater are irrelevant to the issues in the instant case. Ultimately,

Gater requests that his case be dismissed. He cites Fed.R.Crim.Pro. 48 in support of his

request.

"[A] pretrial motion to dismiss an indictment is not a permissible vehicle for

addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*,

230 F.3d 659, 660 (3rd Cir. 2000) (alteration added) (holding that Fed. R. Crim. P.

12(b)(2) authorizes dismissal of an indictment on the grounds that its allegations are not

sufficient to charge an offense but not on the grounds that the evidence is not sufficient to

prove the charges).

> In civil cases, of course, the summary judgment procedures contemplated
> by Federal Rule of Civil Procedure 56 may be utilized to test, pretrial, the
> sufficiency of the evidence to establish triable issues of fact; but there is no
> corollary in criminal cases. The government is entitled to marshal and
> present its evidence at trial, and have its sufficiency tested by a motion for
> acquittal pursuant to Federal Rule of Criminal Procedure 29 . . . [W]e
> simply cannot approve dismissal of an indictment on the basis of
> predictions as to what the trial evidence will be.

*United States v. Ferro*, 252 F.3d 964, 968 (8th Cir. 2001) (quoting *DeLaurentis*,

230 F.3d at 661) (alterations in original).

Gater states that the drugs seized from his residence "were of one nature,

crack cocaine and it was all in one bag not packaged for distribution. Therefore

the crime charged must be for possession." (Doc. 49 at 6.) He also claims that it

was impossible for TFO Sullivan to obtain a warrant, because at one point during

his suppression hearing testimony TFO Sullivan stated he had been at the police

station during the time frame that he applied for the search warrant. *Id.* None of these allegations warrant dismissal of the pending Indictment.

Gater's motion for dismissal should be denied.

## IV. Conclusion

In accordance with the Memorandum above,

**IT IS RECOMMENDED** that the Defendant's Motion (Doc. 26) and Supplemental Motions (Docs. 33 and 35) to Suppress Evidence be **denied**.

**IT IS FURTHER RECOMMENDED** that the Defendant's oral motion for suppression of his written "Request [for] Remission or Mitigation of an Administrative Forfeiture" (*see also* Doc. 53, ¶ 3) concerning the money seized from his residence on December 16, 2014 that was submitted to law enforcement in early 2015 be **denied**.

**IT IS FURTHER RECOMMENDED** that the Defendant's Motion for Discovery and his Motions to Compel (Docs. 24, 31, and 53, respectively) concerning his requests for the Sikeston Department of Public Safety or federal government policies regarding use of informants, request for access to computers, and for Judge Winchester's warrant log be **denied**; and that the Defendants' requests for Grand Jury transcripts of testifying witnesses and with assistance in subpoenaing witnesses be **denied as moot**.

**IT IS FURTHER RECOMMENDED** that the Defendant's Motion for Discovery/Amendments (Doc. 28) be **denied as moot**, in accordance with this opinion.

**IT IS FINALLY RECOMMENDED** that the Defendant's Motion for Dismissal of Charges and Case No. 1:15CR52" (Doc. 49) be **denied as moot**, in accordance with this opinion.

The parties are advised that they have fourteen days in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained. Failure to file timely objections may result in a waiver of the right to appeal questions of fact. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

*Abbie Crites-Leoni*

ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 10th day of September, 2015.